IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| RHONDA M. MORGAN,<br><br>    Plaintiff,<br><br>vs.<br><br>CRST VAN EXPEDITED, INC.,<br><br>    Defendant. | No. C05-0181<br><br>**ORDER** |

_____

This matter comes before the court pursuant to the defendant's December 6, 2006, motion for summary judgment (docket number 15). The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 7). The motion for summary judgment is denied.

The plaintiff, Rhonda M. Morgan, claims that she was sexually harassed while employed by the defendant, CRST Van Expedited, Inc. ("CRST"). She also claims CRST unlawfully retaliated against her with conduct that resulted in her constructive discharge. Morgan has brought an action against CRST on both of these claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e. et seq., and the Iowa Civil Rights Act ("ICRA"), Iowa Code CH 216. CRST moves for summary judgment on both claims. As set forth below, CRST's motion for summary judgment is denied on both claims.

## SUMMARY JUDGMENT

A motion for summary judgment may only be granted if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Kegel v. Runnels, 793 F.2d 924, 926 (8th Cir. 1986). Once the movant

1

has properly supported its motion, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "To preclude the entry of summary judgment, the nonmovant must show that, on an element essential to [its] case and on which it will bear the burden of proof at trial, there are genuine issues of material fact." Noll v. Petrovsky, 828 F.2d 461, 462 (8th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Although "direct proof is not required to create a jury question, . . . to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.' " Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985) (quoting Impro Prod., Inc. v. Herrick, 715 F.2d 1267, 1272 (8th Cir. 1983)).

The nonmoving party is entitled to all reasonable inferences that can be drawn from the evidence without resort to speculation. Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001). The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. Id. Although it has been stated that summary judgment should seldom be granted in employment discrimination cases, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of his or her case. Helfter v. UPS, Inc., 115 F.3d 613, 615-16 (8th Cir. 1997).

## STATEMENT OF MATERIAL FACTS[1]

On March 23, 2004, Rhonda M. Morgan, a resident of Independence, Missouri, applied to be an over-the-road truck driver for CRST Van Expedited, Inc. ("CRST"). CRST is a transport company that utilizes a team approach for its over-the-road drivers in

---

[1] Where disputed, the facts are set forth in the light most favorable to Morgan as the nonmoving party.

which two co-drivers ride together in one truck. CRST is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa.

CRST hired Morgan in March 2004 and she attended a one-week orientation class in Cedar Rapids. Larry McDonough, a CRST employee, taught the class. During orientation, CRST showed the new hires films about sexual harassment and told them that CRST had a policy prohibiting sexual harassment. The new hires were told to contact their fleet managers if they experienced such behavior. During orientation, Morgan also met another new driver named Rick Long. They began dating and agreed to become co-drivers after completing their training.

As part of the training process, CRST required the new drivers to spend four weeks after orientation with lead drivers. Lead drivers teach the student drivers how to drive and perform the job according to company standards. At the end of this training period, lead drivers make recommendations to the Safety Department as to whether the student drivers should be released to co-driver status. Although CRST denies that lead drivers have any authority to hire, fire, demote, or reassign drivers, Morgan claims that she understood the lead driver had the power to fire her and determined whether she reached co-driver status.

After orientation, CRST paired Morgan with a lead driver named Roger Hooper. Morgan met Hooper when he spoke to the orientation class. Morgan claims Hooper told McDonough that he wanted Morgan to be his new student driver. Morgan testified that she was pleased to team up with Hooper because he had 30 years of driving experience. They began driving together on April 2, 2004.

Morgan alleges that problems began between Morgan and Hooper when at their first fuel stop, Hooper insisted that Morgan get out of the truck so he could show her how to fuel. Although Morgan told Hooper that she already knew how to fuel, she got out of the truck as Hooper instructed. She walked around the truck to fuel and saw Hooper urinating on the fuel island. Morgan testified that she was embarrassed by the incident. Hooper apologized and showed Morgan how to fuel. Approximately two days later, Morgan

claims that Hooper stopped the truck while Morgan was sleeping. She alleges that Hooper climbed into bed with her and rubbed her breasts. Morgan testified that she woke up, screamed, and ran to the front of the truck. According to Morgan, Hooper apologized for the incident, but the problems did not end. In the next few days, Morgan claims Hooper attempted to climb back into bed with her and tried to touch her arm whenever she reached for her cup from the passenger seat. She also claims he continued to urinate in and around the truck despite Morgan's complaints about the habit.

Morgan testified that she called Rick McGuin, her fleet manager, to complain about Hooper's conduct. She claims she contacted him by phone instead of through the truck's "Qualcomm" communication device because she feared Hooper would see any message she relayed on the Qualcomm. Morgan maintains that she told McGuin everything about Hooper's behavior, including his urinating habits and attempts to get in bed with her. As a result of her complaints, Morgan testified that she believed CRST was sending them directly back to Cedar Rapids from Clackamas, Oregon. Instead, Hooper and Morgan received a load to Salt Lake City, Utah.

While in Salt Lake City, CRST assigned Hooper and Morgan "city work." Morgan claims that Hooper was unhappy with this assignment and thus, got into a heated argument with the fleet manager and "cussed out dispatch on the Qualcomm." CRST directed Hooper to return with Morgan to Cedar Rapids. During this return trip, Morgan states that Hooper continued to urinate in and around the truck.

Upon returning to Cedar Rapids, Morgan testified that she spoke with Brian Kirchner, a supervisor. Morgan claims that Kirchner said that McGuin informed him of Hooper's behavior and that he already knew everything. Kirchner informed Morgan that she would be paired with a new lead driver. Although Morgan testified that she was pleased CRST paired her with a new lead driver, she maintains she was apprehensive because no one asked about the complaints or told her of any disciplinary action taken against Hooper. Morgan claims that to the best of her knowledge at that time, Hooper had

merely quit working at CRST without any action taken against him. Unbeknownst to Morgan, however, CRST had fired Hooper. The "Notice of Personnel Action Termination Record" for Hooper's firing lists misconduct, refusal to dispatch, and failure to follow directions as reasons for terminating him. (Def. App. 9). In the "Comments" section of the record, it states that Hooper "refused to relay ld in SLC," was "verbally abusive with night dispatch," "always lost his temper then apologized," and "went too far this time." (Def. App. 9).

CRST assigned Morgan a new lead driver named Glen Minor. Minor picked Morgan up a week later in Missouri. They drove together from April 14 to April 23. During this time, Morgan alleges that Minor incessantly referred to Morgan as "hon," "sugar pie," or "babe."[2] Morgan testified that she repeatedly asked Minor to call her by her name, but Minor refused to heed her request. She further claims that Minor put his arm around Morgan and continued to call her names whenever they were around people while stopped for a load. Morgan also alleges that one night in Wyoming, they stopped because Minor wanted to get drunk. After he was done drinking, Morgan claims that Minor asked her to sleep with him. Morgan testified that she told him "no" and that she had a boyfriend. Morgan admits that Minor did not pursue it any further.

Morgan testified that she complained to Lance Riley, her fleet manager at the time, from a payphone in Blythewood, South Carolina. Again, Morgan claims that she did not want to use the Qualcomm because Minor controlled it and she feared he would see the message. She testified that she told Riley everything and requested that she be assigned a new lead driver. Although Morgan asserts that Riley said he would get Morgan a new lead driver and get her back to Cedar Rapids, CRST sent Morgan and Minor to Wisconsin or Michigan. During that time, Morgan alleges that Minor continued to refer to Morgan by inappropriate names. At one point, Morgan claims she even screamed at Minor over

---

[2] Although Minor denied calling Morgan "babe" and called Morgan's complaint "nothing but a pack of lies," he later admitted that "babe" is something he says to women.

the name calling. Morgan alleges that Minor's only response to the screaming was, "Yes, sugar pie."

Before reaching Cedar Rapids, Minor dropped Morgan in Riverdale, IL, where she met Long. Morgan testified that she received a Qualcomm message that she needed to go with a new lead driver, Rashan George, because she took a week off and had yet to complete her driving time with a lead driver. Long drove Morgan to Joliette, IL to meet George. At this time, Morgan claims that she and Long again discussed dating and their intention to be co-drivers.

George was Morgan's third lead driver. They spent roughly two weeks together and did not have problems. In fact, Morgan testified that she confided in George about her experiences with Hooper and Minor. She claims that George called their conduct "messed up" and "inappropriate." While with George, Morgan also testified that she contacted McDonough, her orientation supervisor, about her problems. She claims that McDonough instructed Morgan to complete "green sheets" and submit them to CRST's human-resources department. Morgan followed his instructions and submitted the papers. After finishing with George, Morgan qualified to be a co-driver.

On May 7, 2004, Morgan and Long began driving together. At this point, Long and Morgan were engaged in a consensual-sexual relationship. However, Morgan contends that she was afraid of Long. Morgan claims that Long would cry while he was driving and told her that his dead mother sent Morgan to him as a sign. Morgan also claims that Long kept her in sight at all times, even standing outside the bathroom while Morgan was inside. Morgan did not report this behavior to Raychelle Kiley, her fleet manager, while on this trip with Long.

After driving with Long for one or two weeks, Morgan requested some home time. She had not been home since she left with Minor, which was roughly four weeks before. Prior to her home time, Morgan testified that she and Long got into an argument. Morgan claims that she told Long his driving and behavior scared her. When she got out of the

truck in Independence, Morgan also claims she told Long "she was done with him." She alleges, however, that Long continued to call and visit her. Morgan even claims that while she was staying with her sister, Long would show up at one or two o'clock a.m. and walk around the house. Morgan testified that she talked to Kiley and told Kiley that CRST needed to get Long out of Independence.

During this time at home, Morgan met a recruiter from J.B. Hunt, another trucking company. She decided to leave CRST and traveled to Rogers, AK to begin orientation. While Morgan was in Arkansas, she alleges Long continued to call Morgan's mother's house, sometimes early in the morning. Morgan's mother, however, had caller ID and did not answer the phone. During orientation, Morgan states that J.B. Hunt informed her that CRST refused to provide J.B. Hunt with necessary information. Morgan claims she contacted Kiley, who told her to talk to Kirchner. Morgan asserts that Kirchner asked Morgan to return to CRST and that she agreed to come back.

Upon her return, Morgan requested that CRST pair her with a new co-driver named Trent Burnsed. Morgan and Burnsed met while Morgan was driving with George. Morgan claims that Burnsed was looking for a new co-driver and gave Morgan his number to call him if things did not work with Long. CRST granted the request and paired Morgan and Burnsed together. The company arranged for a driver to pick Morgan up in Missouri and take her to Georgia to join Burnsed.

Things initially went well for Morgan and Burnsed. However, on the way to Fontana, California, Morgan alleges that Burnsed began making comments like, "[t]hat mountain looks like a hard-on." Although Morgan asserts that she did not engage in any discussions of sex or sex-related topics with Burnsed, she claims Burnsed talked about women masturbating and touched himself while he did so. In California, Burnsed became upset with CRST because he believed the company was only assigning him "city work." Morgan claims Burnsed yelled at their fleet manager, James Parker, and threw the Qualcomm around the truck. According to Morgan, after the Qualcomm almost hit her,

7

she told Burnsed that she was getting out of the truck. She claims that she reported Burnsed to Don Practelli, the training supervisor in California.

Morgan also testified that she reported her problems with Burnsed to Parker. Parker testified that when a driver complains about a co-driver, his practice was to usually get the other side of the story and then determine the proper action. In this case, however, Morgan alleges that Parker told her to get back in the truck with Burnsed or find her own way home. Morgan found another way home. She rode with Jim Dohs, a lead driver, from California to New York and back to Cedar Rapids. During that trip, Morgan was off duty and did not log any miles. She does not allege any inappropriate conduct by Dohs.

On the way back to Cedar Rapids, Morgan testified that she contacted Brad Z., who she believed to be a supervisor. Morgan claims she told Brad Z. that Long continued to call her and wanted her back as his co-driver. Although Morgan says she told Long that she would drive with him again, she testified that she told Brad Z. "behind Long's back" that she did not want to ride with Long and preferred someone else if possible. She admits, however, that she also told Brad Z. that she would ride with Long if CRST could not find her another driver. Morgan alleges that Brad Z. told her that when she got back to Cedar Rapids he would pair her with another woman from Independence.

Morgan got back to Cedar Rapids with Dohs and found that she was assigned to a load with Long. It was a weekend night, so there was not a fleet manager working to manage Morgan's assignment. Morgan claims she talked to someone else about the woman driver from Independence, but he or she told Morgan that nothing could be done about changing her co-driver until Monday morning. Morgan testified that she decided to go with Long because she was under a load and assigned to go with him. Morgan, however, maintains that she made it clear to Long that they were strictly working together as co-drivers.

8

On June 12, 2004, while Morgan was sleeping and Long was supposed to be driving, Morgan alleges Long pulled the truck over to the side of the road. She claims he proceeded to masturbate in her bed. Morgan testified that she only awoke when her bed started shaking and she heard Long breathing heavily. She claims Long told her what he was doing and she jumped up, yelled at Long, and ran to the front of the truck. According to Morgan, Long got dressed and apologized to her. Morgan claims she called the dispatcher who asked her why she did not call the police. She also states that the supervisor or dispatcher told Morgan that he or she would try to get her off the truck and relay the load a couple states over. Morgan testified that she thought that response was "not good enough" and had her ex-husband come and get her.

Morgan claims she talked to Kiley when she returned home to Independence and asked if she could drive without a co-driver. Morgan said that if this was not possible, she would not be able to work for CRST anymore. Morgan claims that Kiley told her to talk to Kirchner and Kirchner refused her request. Although Morgan recognized that CRST had a team-driver concept, she claims that the driver who took Morgan to Georgia to meet Burnsed told her that he drove solo. Faced with the choice of quitting or driving with a co-driver, Morgan quit.

## CONCLUSIONS OF LAW

### Analytical Framework

Based on these allegations, Morgan has brought sexual-harassment and retaliation claims against CRST under Title VII and the ICRA. Both Title VII and the ICRA prohibit sex-based employment discrimination. Henthorn v. Capitol Comm'ns, Inc., 539 F.3d 1021, 1026 (8th Cir. 2004) (citing 42 U.S.C. § 2000e-2 and Harris v. Forklift Sys's, Inc., 510 U.S. 17, 21 (1993)); Vivian v. Madison, 601 N.W.2d 872, 872-73 (Iowa 1999). "The sex discrimination provisions of Title VII and the ICRA were enacted to stop the perpetuation of sexist or chauvinistic attitudes in employment which significantly affect employment opportunities." Pecenka v. Fareway Stores, Inc., 672 N.W.2d 800, 804

(Iowa 2003). "The ICRA was modeled after Title VII" and therefore, "Iowa courts … traditionally turn to federal law for guidance in evaluating [it]." Vivian, 601 N.W.2d at 873; see also Madison v. IBP, Inc., 330 F.3d 1051, 1058 (8th Cir. 2003); Krambeck v. Children and Families of Iowa, Inc., 451 F. Supp. 2d 1037. 1041 (S.D. Iowa 2006); Pecenka, 672 N.W.2d at 803. "It is widely accepted in the Eighth Circuit that generally no distinction is made between claims based on federal law and comparable state law claims under the ICRA." Soto v. John Morrell & Co., 285 F. Supp. 2d 1146, 1177-78 (N.D. Iowa 2003) (internal citations omitted). Therefore, this court will analyze the Title VII and ICRA claims under federal law unless a distinction must be drawn.[3]

### Sexual-Harassment Claim

CRST argues that it is entitled to summary judgment on Morgan's sexual-harassment claims. Although Morgan does not allege quid-pro-quo sexual harassment, "[w]hen the discrimination is not patent, a plaintiff may still prevail by showing that the inappropriate conduct creates a 'hostile work environment.' " Henthorn, 359 F.3d 1026 (citing 29 C.F.R. § 1604.11(a)(3) (2004)). "Both quid-pro-quo and hostile work environment sexual-harassment claims are grounded in the same legal theory under Title VII" and are analyzed similarly. Id.

To establish a *prima facie* case of sexual harassment, a claimant must show: (1) he or she was a member of a protected group; (2) unwelcome harassment occurred; (3) such harassment was based on sex; (4) "the harassment affected a term, condition, or privilege of employment," and (5) the employer "knew or should have known of the harassment and failed to take proper remedial action." Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1047 (8th Cir. 2005) (citing Erenberg v. Methodist Hosp., 357 F.3d 787, 792 (8th Cir. 2004)). The fifth element, however, only applies when the harassment involves non-supervisory employees. Bradley v. Widnall, 232 F.3d 626, 631 & n.5 (8th Cir. 1999)

---

[3] For purposes of this motion, neither party to this case has raised an issue that they claim should be handled under a separate ICRA analysis.

(citing Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir.1999)). When harassment involves supervisory employees, the employer is vicariously liable if the first four elements are met. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998) (holding that employers are vicariously liable for sexual harassment committed by supervisors). For purposes of this motion, the defense has argued that even if Morgan's allegations prove true, she cannot establish elements four and five. Therefore, for purposes of this motion, the court will assume Morgan's allegations establish elements one, two, and three.

Whether the Alleged Harassment Affected a
Term, Condition, or Privilege of Morgan's Employment

Courts apply a "two-fold inquiry" to determine whether "complained--of conduct altered a term, condition, or privilege" of employment. Kratzer, 398 F.3d at 1047. "First, the harassment must be sufficiently severe or pervasive to create an 'objectively hostile' work environment." Id. (quoting Henthorn, 359 F.3d at 1026). Second, the victim must "subjectively perceive the environment as abusive." Id. (citing Harris, 510 U.S. at 21-22).

In order for conduct to be "objectively hostile" under the first inquiry, "[i]t must be more than merely offensive, immature or unprofessional; it must be extreme." Id. (citing Henthorn, 359 F.3d at 1027 (internal citations omitted)). "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." Id. (quoting Scusa v. Nestle U.S.A. Co., Inc., 181 F.3d 958, 967 (8th Cir. 1999)). "There is no bright line between sexual harassment and merely unpleasant conduct," therefore the court must "view the 'totality of the circumstances' in determining whether there is a hostile work environment." Henthorn, 359 F.3d at 1026 (citing Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997); Klein, 198 F.3d at 709). "A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it 'into a series of discrete incidents.'" Carter, 173 F.3d at 702 (internal citations omitted). Therefore, the court must consider "all circumstances … including the frequency of the offending conduct, its severity, whether

11

it was physically threatening or humiliating, and whether it unreasonably interfered with work performance." Hesse v. Avis Rent a Car Sys., Inc., 394 F.3d 624, 630 (8th Cir. 2005).

Under the second, subjective inquiry, an employee must actually have felt harassed. Kratzer, 398 F.3d at 1047. If the employee did not subjectively feel harassed, "an employee's admission that [the conduct] was not abusive is fatal to the employee's Title VII sexual harassment claim." Id. at 1047-48 (citing Montandon v. Farmland Ind., Inc., 116 F.3d 355 (8th Cir. 1997) and Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001)).

Morgan contends that Hooper, Minor, Long, and Burnsed sexually harassed her while she worked at CRST. Morgan, however, admits that she only considered Burnsed's sexual comments to be "weird" and "minor-type things." (Morgan Dep. 118, Pl.'s App. 69). Thus, Burnsed's actions do not qualify as sexual harassment because they were not extreme and did not subjectively alter Morgan's working conditions.

Based on Morgan's allegations, however, there is a genuine issue of material fact as to whether Hooper, Minor, and Long's conduct rose to the level of affecting a term, condition, or privilege of her employment. Hooper allegedly rubbed Morgan's breasts, repeatedly urinated in front of her, tried to crawl into bed with her on multiple occasions, and repeatedly tried to place his hand on her arm. Minor allegedly put his arm around Morgan at stops, called her inappropriate names after she asked him to stop, and asked her to sleep with him. Long allegedly pulled the truck over while he was supposed to be driving and awoke Morgan by masturbating in her bed while she slept. Although Long and Morgan previously engaged in a consensual-sexual relationship, Morgan claims that she made it clear to Long that they were not in a relationship at the time this conduct occurred. If these allegations were to prove true, a reasonable jury could conclude that this conduct was more than merely offensive, immature, or unprofessional behavior.

12

Additionally, Morgan testified that she was frightened to use the Qualcomm to report the drivers because she was afraid of their reactions. She claims her fear of these men and their behavior caused her to leave the truck on multiple occasions and find her own way home. Based on these allegations, a reasonable jury could conclude that this prevented Morgan from doing her job. For these reasons, there is a genuine issue of material fact as to whether the alleged sexual harassment affected a term, condition, or privilege of Morgan's employment. Therefore, summary judgment cannot be granted as to this element of Morgan's claim.

### Whether CRST Took Proper Remedial Action

Even if the first four elements of the sexual-harassment test are met, CRST contends that it is entitled to summary judgment on Morgan's sexual-harassment claim because it argues that even if Morgan's allegations are true, she cannot meet the fifth element of the sexual-harassment test. The fifth element of the sexual-harassment test requires a claimant to show that the employer "knew or should have known of the harassment and failed to take proper remedial action." Kratzer, 398 F.3d at 1047 (citing Erenberg, 357 F.3d at 792).[4] For purposes of the motion, CRST concedes that there is a genuine issue of material fact as to whether CRST knew or should have known of the alleged harassments. CRST argues, however, that Morgan cannot present a genuine issue of material fact as to whether CRST failed to take remedial action.

To prove that CRST failed to take proper remedial action, Morgan must demonstrate that CRST "failed to take prompt remedial action reasonably calculated to end the harassment." Bailey v. Runyon, 167 F.3d 466, 468-69 (8th Cir. 1999) (quoting Davis v. Tri-State Mack Distributors, Inc., 981 F.2d 340, 343 (8th Cir. 1992) (internal citation

---

[4] As noted above, the fifth element of the sexual-harassment test only applies if the harassers are not supervisors. Bradley, 232 F.3d at 631 & n.5 (citing Carter, 173 F.3d at 700). The Plaintiff's Resistance to Summary Judgment appears to concede, for purposes of this motion, that Long, Hooper, and Minor were not supervisors. (Pl.'s Resp. to Summ. J., 5, 17-21).

omitted)). "The mere existence of a grievance procedure and a policy against discrimination" does not necessarily "insulate [an employer] from liability." Davis, 981 F.2d at 344 (quoting Meritor Sav. Bank v. Vinson, 477 U.S. 57, 72 (1986)). In deciding whether an employer took reasonable action, the court may consider "the amount of time that elapsed between the notice and remedial action," "the options available to the employer," and "whether or not the measures ended the harassment." Carter, 173 F.3d at 702 (internal citations omitted). While Title VII requires employers to take remedial action, it does not "require that an employer fire a harasser." Green v. Franklin Nat. Bank of Minneapolis, 459 F.3d 903, 912 (8th Cir. 2006) (citing Davis, 981 F.2d at 343). "[T]he promptness and adequacy of an employer's response will often be a question of fact for the factfinder to resolve." Id. (internal citations omitted).

CRST had a policy in place against sexual harassment. In its company policy, CRST instructed employees who were subject to harassment to contact their immediate supervisors or the Director of Human Services by phone. (Def.'s App. 77). After receiving a complaint, the company policy stated that CRST would take the following steps:

> 1. Fully inform the employee of his/her avenues to report and redress the harassment to the Company's internal complaint procedure. Advise the employee that s/he will not be disciplined or otherwise retaliated against as a result of making a complaint.
>
> 2. Immediately conduct a thorough, objective and complete investigation of the alleged harassment and make a determination about whether unlawful harassment occurred.
>
> 3. Take prompt and effective remedial action commensurate with the severity of the offense of harassment that occurred.
>
> 4. Advise the employee of actions taken to address the complaint.

(Def.'s App. 77). McDonough, the orientation director, testified that after a driver complained, management "would not necessarily tell the driver to get to Cedar Rapids, [but] they would direct the driver to get to the nearest terminal so she could talk to someone." (McDonough Dep. 11, Pl.'s App. 93). Parker, a fleet manager, stated that in a case of sexual harassment, the affected driver would be removed from the situation for his or her protection. (Parker Dep. 10, Pl.'s App. 89). Riley, a fleet manager, similarly stated that under his understanding of company policy, upon hearing a sexual-harassment claim he would separate the two drivers immediately or as soon as the claimant wanted to separate. (Riley Dep. 8, Pl.'s App. 105). Kirchner, the fleet manager's supervisor, testified that if a driver was on the road, the company would remove the driver from the truck, put him or her in a hotel room, and attempt to place him or her with a new driver. (Kirchner Dep. 7-8, Pl.'s App. 102). He also stated that regardless of the planning inconvenience or the location of the driver, the first option would be to get the driver out of the situation. Id.

Based on Morgan's allegations, CRST did not appear to follow its policy or give Morgan these options when she complained about her alleged harassment. Nevertheless, CRST contends that it took proper remedial actions because it fired Hooper and granted each of Morgan's requests for new drivers. CRST asserts that these actions effectively ended each of Morgan's harassment experiences. Even if this were true, however, there remains a genuine issue of material fact as to whether the measures were adequately prompt. In Hooper's case, CRST fired him days after Morgan claims to have complained. Morgan also alleges that after she complained of Hooper's conduct, CRST sent them to Salt Lake City and assigned them "city work" rather than sending them directly back to Cedar Rapids. Upon returning to Cedar Rapids, Morgan asserts that CRST did not tell her how the company would handle the situation or ask her questions about the incident.

Morgan alleges that CRST continued similar conduct after it fired Hooper. According to Morgan, she complained to Riley about Minor's behavior while in South

15

Carolina. She claims that rather than removing her from the truck or returning her to Cedar Rapids, Riley sent Morgan to Wisconsin or Michigan. Morgan also alleges that even though she previously complained about Long and stated that she would prefer not to ride with him, CRST paired them together a second time. After Long allegedly harassed Morgan, Morgan asserts that CRST requested that she get back in the truck and be relayed on. This allegedly forced Morgan to call her ex-husband to pick her up and take her home. For these reasons, Morgan's allegations raise a genuine issue of material fact as to whether CRST took reasonably calculated actions to promptly end the alleged harassment. Therefore, summary judgment as to this element of the sexual-harassment claim is denied and accordingly, the defendant's motion for summary judgment on Morgan's sexual-harassment claim is denied.

### Retaliation Claim

CRST contends that it is also entitled to summary judgment on Morgan's retaliation claim. In order to establish a *prima facie* case of retaliation, a claimant must show: (1) he or she was engaged in a protected activity, (2) he or suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 502 (8th Cir. 2005). For purposes of this motion, CRST concedes that Morgan engaged in a protected activity by reporting the alleged harassment. CRST argues, however, that Morgan did not suffer an adverse employment action and therefore cannot satisfy the second element of the *prima facie* case for retaliation.

### Whether Morgan Suffered an Adverse Employment Action

CRST contends that Morgan did not suffer an adverse employment action because she voluntarily quit working for CRST. However, when an employer does not terminate an employee in a retaliation claim, the employee can still show an adverse employment action by "offer[ing] evidence sufficient to establish that [he or] she was constructively discharged." Hanenburg v. Principal Mut. Life Ins. Co., 118 F.3d 570, 574 (8th Cir.

1997). CRST claims that there is not a genuine issue of material fact as to whether Morgan was constructively discharged.

"A constructive discharge occurs 'when an employer deliberately renders the employee's working conditions intolerable and thus forces him [or her] to quit his [or her] job.'" Thompson v. Bi-State Development Agency, 463 F.3d 821, 825 (8th Cir. 2006) (quoting Smith v. World Ins. Co., 38 F.3d 1456, 1460 (8th Cir. 1994) (internal citations omitted)). The employer's intent may be satisfied by showing that an employee's resignation was "a reasonably foreseeable consequence of the employer's discriminatory actions." Phillips v. Taco Bell Corp., 156 F.3d 884, 890 (8th Cir. 1998) (internal citations omitted). The court applies an objective standard to determine whether an employee's working conditions are intolerable. Id. (internal citations omitted). Thus, "a plaintiff must demonstrate that a reasonable person would find the working conditions intolerable." Id. Finally, the employee must act reasonably. "[A]n employee has an obligation not to assume the worst and not to jump to conclusions too quickly. An employee who quits without giving [his or her] employer a reasonable chance to work out a problem has not been constructively discharged." Id. (internal citations omitted).

Morgan asserts that a reasonable person in her place would have found the working conditions at CRST intolerable and quit. She also claims that she demonstrates the necessary intent because her resignation was a reasonably foreseeable consequence of the sexually hostile environment at CRST. CRST contends that it paired Morgan with a new driver each and every time she asked and that it would have done so again following her incident with Long. It claims that if Morgan would have selected another driver, there is no evidence that the sexual harassment would have continued. It also argues that Morgan unreasonably quit because she could not be a solo driver.

Given the alleged sexual harassment that took place, there is a genuine issue of material fact as to whether Morgan's working conditions at CRST were objectively intolerable. To survive summary judgment, however, Morgan's allegations must still

17

demonstrate that CRST sought to force her to quit. Thus, Morgan must show that there is a genuine issue of material fact as to whether her resignation was a reasonably foreseeable consequence of the hostile environment at CRST.

Morgan resigned after Long allegedly sexually harassed her during their second stint together. She claims that CRST placed her with Long even though she previously reported problems with him. Morgan, however, admits that she told CRST she would be willing to drive with Long again if it did not pair her with another driver. Thus, it was not reasonably foreseeable that a bad experience with Long would lead Morgan to quit her job.

After Morgan was allegedly harassed, however, she asserts that CRST did not immediately remove her from the truck and take prompt action. Morgan claims that CRST only offered to relay her on, which would have kept Morgan in the truck with her alleged harasser. Based on Morgan's allegations, this was at least the third time CRST failed to promptly remove Morgan from a truck with a driver that allegedly sexually harassed her. Given this pattern of alleged behavior, a reasonable jury evaluating Morgan's claims could find that it was reasonably foreseeable that Morgan would quit her job before getting into a truck with another CRST driver. Such a jury hearing Morgan's allegations could also reasonably conclude that it was reasonable for Morgan to quit rather than face another bad experience with a driver, handled in a similar fashion. For these reasons, there is a genuine issue of material fact as to whether Morgan suffered an adverse employment action and summary judgment cannot be granted as to this element of Morgan's retaliation claim. Therefore, the defendant's motion for summary judgment on Morgan's retaliation claim is denied.

Upon the foregoing,

IT IS ORDERED that defendant's motion for summary judgment (docket number 15) is denied.

February 1, 2007.

_____
JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT